UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LEE WINSTROM, individually and on behalf of his marital community,

Plaintiffs,

v.

NOVELL, INC., a Delaware corporation,

Defendant.

Case No. C05-294RSL

ORDER ON BOTH PARTIES' MOTIONS FOR SUMMARY JUDGMENT

## I. Introduction

This matter comes before the Court on "Plaintiff's Motion for Summary Judgment" (Dkt. # 11) and "Defendant's Motion for Summary Judgment" (Dkt. # 8). Lee Winstrom alleges that Excell, his former employer, breached an agreement to retroactively award him with stock after its merger with a third party. Novell, which ultimately purchased the merged companies, argues that Excell fulfilled the letter of the contract, and then some. The parties largely agree on the relevant facts.

## II. Background Facts

In 1994, Lee Winstrom accepted a position at Excell Data Corporation ("Excell").

According to Winstrom, the salary of $84,000 per year represented a pay cut from his prior employment. Winstrom was undeterred, however, because Len Pacheco, the founder of Excell, expressed to him a vision of aggressive growth and generous compensation. In fact, in Pacheco's offer letter to Winstrom, he stated that he expected the position would provide Winstrom "with the opportunity to realize additional compensation over the next three (3) to five (5) years of something in the range of $1.0 million to $2.0 million. This level of compensation . . . is based upon Excell becoming a $30 million to $60 million dollar [sic] company in the next five (5) years." Winstrom Decl. Ex. 1 at 1. The details of this compensation plan were to be solidified at a later date.

Winstrom began work as a Senior Manager at Excell beginning in the summer of 1994. On May 14, 1996, Excell initiated a Phantom Stock Plan ("the Plan"). Employees who were invited to participate in the Plan were given a certain number of shares of "phantom" stock in Excell. The purpose of the Plan was to "promote the shareholder point of view among key employees of the Corporation." Winstrom Decl. Ex. 3 at ¶ 1. Phantom stock acted like regular common stock in the company, in that employees received credits at the end of each fiscal year based on the hypothetical earnings per share. Also, employees could, after their benefit commencement date, cash in their phantom stocks for cash or real stocks of commensurate value.

Winstrom's phantom stock plan consisted of 25,000 units and had a retroactive award date of August 30, 1994. The shares vested over a five year period according to the following pattern (total vesting in parentheses):

| | | |
|---|---|---|
| Year One: | 5% | (5%) |
| Year Two: | 10% | (15%) |
| Year Three: | 15% | (30%) |
| Year Four: | 30% | (60%) |
| Year Five: | 40% | (100%) |

The Plan also contained a modified retroactive vesting schedule that would be triggered by a change in control, which was defined, among other things, as the merger or sale of the company.

Winstrom Decl. Ex. 3 at ¶ 2.8. Pursuant to the change in control vesting schedule, Winstrom's shares would retroactively vest at a rate of 20% per year. Id. at ¶ 8.3. Winstrom's receipt of this retroactive vesting, however, was contingent upon his completion of one year of employment at Excell or its successor corporation, or his termination without cause. Id. at ¶ 8.3.

Excell progressed more or less according to Pacheco's vision and in August, 1998, Pacheco had found a serious merger candidate, Cambridge Technology Partners ("Cambridge"). One of the conditions of the merger agreement was that Excell would terminate the Plan. According to Winstrom, Excell was able to secure agreements from all of the Plan participants to release their interests in the Plan in exchange for lump sum payments.

Winstrom, by chance, was on vacation in Alaska and unreachable during the final week of August, 1998. Because Winstrom was gone, Excell was unable to offer him—and he was unable to accept—the new contract to release his rights under the previous contract in exchange for a lump sum payment. The deal to sell Excell to Cambridge, however, could not go forward with the outstanding Plan liability to Winstrom. The company proceeded as follows: Excell's president, Carv Moore, fired Winstrom effective Friday, August 28, 1998 and re-hired him effective Monday, August 31, 1998. See Novell Motion at 3 (termination date) and Winstrom Decl. Ex. 5 (re-hire date). According to Excell's logic, even though Winstrom would be an active employee on Friday and the next Monday, because he was "fired" over the weekend, his termination ended any of his rights under the Plan. Winstrom was informed of his termination when he returned to work on August 31. Winstrom asserts, and Novell does not dispute, that he was told that he was terminated "for convenience." Winstrom Motion at 5.[1]

According to Winstrom, his "new" position with Excell was exactly the same as his

---

[1] Winstrom's vesting rights under the plan would change dramatically upon both (1) August 30, when Winstrom would complete his fourth year of service under the Plan (from 30% to 60%), and (2) August 31, the scheduled date for the merger with Cambridge, which would trigger the change in control provision under the Plan (from 60% to 80%). Thus, the "convenience"—the elimination of these Plan obligations—accrued solely to Excell.

previous position: "Prior to August 31, 1998, Winstrom's duties at Excell included negotiation and management of contracts. After August 31, 1998, he was essentially doing the same job he was doing before." Motion at 7. In fact, his new salary was almost exactly the same as the salary he was originally hired at in 1994 (it was $9.60 less). However, Winstrom's new position was considered "part-time" because he was asked only to work a 32-hour week. Winstrom was also given a new employment agreement. Winstrom Decl Ex. 6.

Cambridge ultimately became part of Novell, the defendant in this lawsuit. Novell does not dispute that it is the proper target for the instant suit. Instead, Novell argues that because Winstrom was terminated prior to his fourth year of service and prior to any event triggering the change in control provision of the Plan, Excell was obligated to pay Winstrom only for the value of his shares based on three years of vesting (30%).[2]

## III. Discussion

Winstrom raises three arguments in his various briefs: (1) That there is a factual dispute as to the date of his termination; (2) that the circumstances of his employment created an implied agreement that he would be terminated only for good cause; and (3) that Excell breached an implied covenant of good faith and fair dealing when it terminated him just before the change in control. There is no genuine dispute of the relevant material facts, permitting summary judgment. See Fed. R. Civ. P. 56(c).

### A. Termination Date

If Winstrom's termination date was the day that he was told that he was terminated, August 31, then he is entitled to straight line vesting totaling 80%. This termination date would set the benefit commencement date "on or after the date of [the] Change in Control," which triggers the retroactive straight line vesting. Winstrom Decl. Ex. 3 at ¶ 8.3. Winstrom argues for this result.

---

[2] Novell argues for 30% from a rhetorical standpoint. In fact, Excell compensated Winstrom based on 60% vesting.

The law does not require formal termination notification for at-will employees, and Excell had no independent procedure. Thus, the absence of a formal termination notification on Friday, August 28 does not render the termination ineffective pending Winstrom's actual notice on Monday, August 31. To the contrary, Winstrom's pay stub provides direct evidence that Friday, August 28 was his last day of work, and the correct date to use as his termination date and benefit commencement date under the Plan. Moreover, circumstantial evidence supports the conclusion that Winstrom was fired on Friday: Excell would have been unable to go forward with the Cambridge merger absent this action. The Court finds no genuine issue of material fact as to the date of Winstrom's actual termination.[3]

**B. Implied Termination only for Good Cause**

Winstrom claims that the circumstances of his employment created an implied agreement that he would be terminated only for good cause. Response at 9. The Washington Supreme Court has recognized an exception to the at-will employment doctrine that prevents an employer from terminating an employee for any reason other than good cause where "(1) there is an implied agreement to that effect or (2) the employee gives consideration in addition to the contemplated service." Thompson v. St. Regis Paper Co., 102 Wn.2d 219, 223 (1984). Novell contends that Excell's employment of Winstrom does not fit these exceptions.

Winstrom argues that the promises of deferred compensation "created an atmosphere of job security and fair treatment for key employees with regard to those employees' interests in the [Plan]." Response at 9. Winstrom claims this atmosphere was created by the offer letter, which stated that the company was planning to create an incentive program that would give him an "opportunity to realize additional compensation over the next three (3) to five (5) years of

---

[3] This conclusion should not be read to credit defendant's argument that Winstrom's current speculation about his actual termination date is a contradiction of prior deposition testimony. It is clear that Winstrom's deposition testimony sets forth what he was told by Excell regarding his date of termination. Winstrom's current argument simply suggests that there might be a difference between what Excell has said happened and what actually happened.

something in the range of $1.0 to $2.0 million." Winstrom Decl. Ex. 1.

This approach fails. First, as Novell notes, Winstrom signed an employment contract that specifically stated that his employment was at will. Winstrom Decl. Ex. 2. Although the employment contract incorporates by reference any promises from the offer letter, it is explicit that the employment is at will. See id. at 3 (incorporation) and 2 (at will). Thus, not only is the employment agreement explicit where the offer letter is ambiguous, it was also agreed upon *after* the offer letter, and so cannot be understood as a "subsequent modification" of the at-will employment agreement. See Swanson v. Liquid Air Corp., 118 Wn.2d 512, 530 (1992) ("[O]nce a disclaimer providing employment at will is signed by an employee, *excepting any subsequent modification*, the employee may be terminated for any, or no, reason.") (citation and internal quotations omitted).

Second, the promises of deferred compensation on which Winstrom relies are inadequate to create an implied contract. Washington courts have found that giving the "consideration" of deferred compensation, in the form of an anticipated pension in lieu of immediate salary, does not constitute adequate independent consideration to trigger an exception to the at-will employment doctrine. Roberts v. Atlantic Richfield Co., 88 Wn.2d 887, 896 (1977). Beyond the implication that Winstrom would be eligible for deferred compensation after several years, the letter contains no assurances about the termination process. Thus, not only did Winstrom explicitly agree that his employment was at will, the offer letter was inadequate to create an implied contract requiring good cause for termination.

**C. Implied Covenant of Good Faith Performance of Benefits Contract**

Contrary to defendant's assertions, the Washington Supreme Court has held that the implied covenant of good faith and fair dealing applies to employment contracts, as any other kind of contract. Barrett v. Weyerhauser Co., 40 Wn.App. 630, 635 (1985) ("Washington courts have held that in every contract there is an implied covenant of good faith and fair dealing that obligates the parties to cooperate with one another so that each may obtain the full benefit of

performance."). The Court has hesitated only when the covenant might limit the at-will employment doctrine. See id. at 635 n.6. (stating that the covenant "should not be read to endorse the view that an implied covenant of good faith and fair dealing limits an employer's discretion in terminating an at will employee."); see also Thompson, 102 Wn.2d at 227–28; Parnar v. Americana Hotels, Inc., 652 P.2d 625, 629 (Haw. 1982) ("[A] duty to terminate in good faith would subject each discharge to judicial incursions into the amorphous concept of bad faith."). However, the Court has indicated its willingness to consider joining other jurisdictions that have limited the at-will employment doctrine, given a persuasive fact pattern. Willis v. Champlain Cable Corp., 109 Wn.2d 747, 754 (1988) ("Whether it would be applicable in cases of egregious employer abuse where discharge was for the purpose of defeating accrued commission and the contract is silent on compensation is not before us.") (citing Lex K. Larson, UNJUST DISMISSAL § 3.05[2], at 3-22 to 3-25 (1987)); accord Trimble v. Wa. State Univ., 140 Wn.2d 88, 97 (2000) ("However, under some egregious circumstances an implied covenant of good faith may be appropriate.") (citing Willis).

Other jurisdictions "have applied such a covenant in order to fashion a remedy against specific employer abuses, particularly where the employee's discharge was for the purpose of defeating his rights to commissions or other monetary benefits." Lex K. Larson, UNJUST DISMISSAL § 3.05[2], at 3-34 (2005) (citing Fortune v. Nat'l Cash Register Co., 364 N.E.2d 1251 (Mass. 1977) and Mitford v. de Lasala, 666 P.2d 1000 (Alaska 1983)). California has suggested it will join those courts given the right fact pattern. Guz v. Bechtel Nat., Inc., 24 Cal. 4th 317, 352–53 n.18 (Cal. 2000) ("[T]he covenant might be violated if termination of an at-will employee was a mere pretext to cheat the worker out of another contract benefit to which the employee was clearly entitled, such as compensation already earned."). These opinions seek to allow terminated employees to recover already-earned benefits from employers who attempt, in bad faith, to deprive employees of those benefits through termination.

At oral argument, defense counsel hypothesized that if Winstrom had been in town on

Friday, August 28, Excell would have forced him to accept a buy out at 60% vesting or be terminated with only 30% vesting. Such treatment highlights why Washington courts regularly have been tempted to limit the at-will employment doctrine in the presence of independent promises of benefits. The at-will employment doctrine is designed to allow an employer to run his business as he chooses, not insulate an employer's bad faith refusals to fulfill contracts for compensation.

On the other hand, Washington law counsels this Court to tread cautiously when a party seeks to re-write the terms of his contract. Annual (not monthly), and graduated (not straight line) vesting schedules are unattractive terms for employees and are designed to provide employers with significant freedom to conserve equity. These are, however, the terms to which Winstrom agreed, and Washington law does not put this Court in a position to modify them. It is possible that Winstrom accepted unfavorable vesting terms in exchange for a larger total award. The facts do not disclose the parties' motivations, but the contract before the Court is presumed to represent a bargained-for exchange.

The Court concludes that this fact pattern is not adequately egregious to satisfy the Willis caveat. Willis, 109 Wn.2d at 754 ("Whether it would be applicable in cases of egregious employer abuse where discharge was for the purpose of defeating accrued commission and the contract is silent on compensation is not before us."). From its powerful bargaining position, Excell was not without legal support for calculating Winstrom's vesting at 30%. This would have qualified as egregious bad faith. Instead, Excell acknowledged Winstrom's service and awarded him with 60% of his total award of phantom shares under the Plan. The Court concludes that Excell's failure to compensate Winstrom at 80% vesting of his award does not constitute bad faith sufficient to limit Excell's right to terminate employees at will.

## IV. Conclusion

For the foregoing reason, IT IS HEREBY ORDERED that "Plaintiff's Motion for Summary Judgment" (Dkt. # 11) is DENIED, and "Defendant's Motion for Summary Judgment"

(Dkt. # 8) is GRANTED.

DATED this 14th day of June, 2006.

Robert S. Lasnik
United States District Judge